IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


MOVIE GALLERY US, LLC,     )
                          )
    Plaintiff,        )
                          )     CIVIL ACTION NO.
    v.               )     2:07cv1032-MHT
                          )        (WO)
MARK W. GREENSHIELDS,     )
ASSOCIATED SOURCING, and   )
ASSOCIATED SOURCING        )
HOLDINGS, INC., d/b/a     )
Video Library,          )
                          )
    Defendants.       )

OPINION

Plaintiff Movie Gallery US, LLC, a company specializing in the rental and sale of movies and video games, has brought this lawsuit against defendant Mark Greenshields and two of his companies (defendants Associated Sourcing and Associated Sourcing Holdings), asserting several claims of unfair-trade practices under federal and state law related to Greenshields's entry into the movie 'racking' business and his use of the VIDEO LIBRARY mark.  This court has jurisdiction pursuant

to 28 U.S.C. § 1331 (federal question), § 1332 (diversity), and § 1367 (supplemental).

Based on the evidence presented at a bench trial, the court finds in favor of Greenshields, Associated Sourcing, and Associated Sourcing Holdings and against Movie Gallery.

## I. FACTUAL SUMMARY

In 1980, Becky Reno founded Video Library, Inc. in Billings, Montana.  Video Library's business eventually grew to include a retail business, which consisted of several video rental stores, as well as a racking business, in which Video Library contracted with local grocery and convenience stores to place small racks of videos for sale and rental in many locations throughout several States.  This dispute concerns that racking business.

Throughout its life as a Montana corporation, Video Library used the VIDEO LIBRARY mark both at its stores

and in its racking locations. The company ran
advertisements, engaged in community outreach, purchased
billboards, and displayed the VIDEO LIBRARY mark on its
video racks in many of its independent-retail stores.

In 2003, Reno sold Video Library to Movie Gallery.[1]
As part of this sale, Movie Gallery specifically
purchased the VIDEO LIBRARY mark and all the rights
associated with it. Movie Gallery converted Video
Library's retail-video stores to Movie Gallery stores but
continued to operate the video-racking business using the
VIDEO LIBRARY mark. This Video Library division at Movie
Gallery had two components: a video 'rental racking'
business in which consumers would rent videos from the
racks available in the local grocery or convenience store
and a video 'sell-through' business in which Movie
Gallery would place excess inventory from its own stand-
alone video-rental stores into independent stores for

_____

1. Reno sold Video Library to M.G. Midwest, Inc., a
company that then merged with M.G.A., Inc. to create
Movie Gallery US. Movie Gallery US subsequently changed
its name to Movie Gallery US, LLC.

consumers to purchase. Movie Gallery's customers were generally small, independent stores from which individual consumers would rent or purchase videos.

After the acquisition of Video Library, Movie Gallery emphasized the sell-through portion of the business because it enhanced the ability to profit from used inventory from its many national-rental stores. While this portion of the business expanded, the racking division suffered. It began steadily losing a large percentage of its accounts with independent-retail stores. Employees of the racking division became concerned with Movie Gallery's decision not to expend resources to maintain and grow that portion of the business. Moreover, Movie Gallery as a whole has experienced significant financial difficulties in the several years since its purchase of Video Library, eventually going through bankruptcy proceedings.

In the fall of 2006, Greenshields became interested in purchasing the racking division from Movie Gallery

4

after speaking with his friend, Adam Plymale, who was an employee of Movie Gallery's Video Library division. Greenshields began discussions about the potential purchase with John Piwetz, Movie Gallery's corporate representative. The parties eventually entered into a confidentiality agreement, pursuant to which Movie Gallery shared with Greenshields a great deal of information about its business. This information included, among other things, wholesale-supplier information, examples of customer-lease agreements, and detailed customer information, including contact information, locations, product information, and revenue and billing information. After reviewing that information, Greenshields decided that he wanted to purchase the division, and he and Piwetz agreed on a price that they thought was fair.[2]

---

[2]  The agreed price was $ 1,000,000.  Greenshields had originally hoped to purchase both the rental and sell-through portions of the business.  However, the larger purchase fell through after Greenshields had difficulty obtaining financing.

On May 21, 2007, Movie Gallery's board of directors unexpectedly rejected the proposed sale.  The parties have disputed the finality of this rejection; Greenshields states that he thought the agreement would eventually go through, even if it were just a question of a higher-purchase price.  Movie Gallery asserts that it communicated to Greenshields that the deal was dead.  It is undisputed, however, that two days after the sale was rejected, Greenshields applied with the United States Patent and Trademark Office to register the VIDEO LIBRARY mark.  Several weeks later, Greensheilds applied to use the same mark in the State of Washington.

Greenshields also started his own video-racking business, and he eventually hired three former Movie Gallery employees: Jerrod Smith, Andrew Kiel, and his friend Plymale.  These employees began working for Greenshields between late July and mid-August 2007, and all three had been with Movie Gallery since before it had purchased the company from Reno.  Kiel and Plymale were

6

account representatives and salespeople responsible for recruiting stores and managing relationships with the independent stores.   Smith had been Video Library's general manager.   Each of these employees had intimate knowledge of the video-racking business, and Smith in particular as general manager had access to a tremendous amount of information about Movie Gallery's racking business.   Smith had also signed a 'Non-Solicitation & Confidentiality Agreement' with Video Library in 1999.

Over the next few months, Smith, Kiel, and Plymale began building Greenshields's video-racking business. They solicited business customers and installed racks in the stores.   Greenshields himself was not significantly involved in the development of the business.   Smith, Kiel, and Plymale had extensive experience in the business, as well as many relationships with potential customers built over many years working in the industry. Smith, Kiel and Plymale were also aware of the logistical needs of a nascent video-racking company, including for

7

example, where to purchase product.  They also searched on the internet and found video-rental software which they knew their company needed to install at customer sites.

Several of the initial-customer leases given to independent stores indicated that Greenshields was doing business as, among other names, "Video Library."  The same language appeared on the initial-employment agreements drafted by Greenshields's counsel and signed by Smith, Kiel, and Plymale.  Some of Greenshields's new stores were former Movie Gallery customers.  Eventually, Greenshields ended up with several dozen racking customers in several States.  Fewer than half of these customers had been prior Movie Gallery customers.  During this time period, Movie Gallery continued to lose customers, many of whom did not switch to Greenshields.

Movie Gallery filed this lawsuit in October 2007, claiming that Greenshields and his two companies had breached a confidentiality agreement, violated state

trade-secret laws, tortiously interfered with Movie Gallery's business and contractual relationships, and violated § 43 of the Lanham Act, 15 U.S.C. § 1125, as well as state trademark-infringement common law and unfair-trade-practices laws.  Movie Gallery seeks both damages and a permanent injunction against Greenshields and his companies from participating in the video-racking business.  Since that time, Movie Gallery and Greenshields have continued to compete against each other in the video-racking business.

## II.  DISCUSSION

As stated, Movie Gallery claims that Greenshields and his two companies breached a confidentiality agreement, violated state trade-secret laws, tortiously interfered with Movie Gallery's business and contractual relationships, and violated the Lanham Act as well as state trademark-infringement common law and unfair-trade-practices laws.

9

A. Breach of Confidentiality Agreement

Movie Gallery first alleges that Greenshields used the confidential information given to him during the sale negotiations to set up a competing racking business once the deal fell through.

Each side presented a great deal of evidence on the breach-of-confidentiality-agreement issue at trial. This breach-of-contract claim is, at its heart, circumstantial in nature. According to Movie Gallery, the combination of several different categories of evidence leads to the conclusion that Greenshields must have breached the confidentiality agreement. Specifically, the court heard evidence concerning the nature of a video-racking business, describing the specific ways in which Greenshields developed his racking company, recounting the putative speed with which Greenshields got off the ground, and detailing the specific and extensive information given to Greenshields by Movie Gallery

10

pursuant to the confidentiality agreement entered into by the two parties before their courtship soured.

The confidentiality agreement provided that Greenshields "shall make no use (commercial or otherwise) of the Confidential Information" provided to him.  Pl.'s Ex. 1 at ¶ 1.  The agreement also contained an extensive definition of "Confidential Information," which included almost everything one can think of, including trade secrets, customer lists, supplier lists, financial information, marketing information, and "other valuable business information and products."  Id.

The agreement provided, however, that confidential information that is or becomes part of the public domain, or information developed independently by Greenshields, would be exempt.  Moreover, any information or ideas commonly known in the industry were not meant to be included as confidential information.  Finally, the agreement specifically acknowledged that the parties may become competitors and that future-business activities

11

and information developed may closely mirror the business activities of the other party.  The agreement also contemplated that future-business activities may originate with the other party's employees and may duplicate the confidential information disclosed pursuant to the agreement.  Pl.'s Ex. 1 at ¶ 4.

The parties agree that this agreement was a valid contract under Alabama law.  The only dispute here is whether Greenshields breached the agreement and, if so, what remedy is proper.

Movie Gallery's trial-litigation strategy, in a nutshell, was to lay out in extensive detail much of the important information that it gave (or that its former employees could have given) to Greenshields.  Movie Gallery then sought to demonstrate that this information would be crucial in setting up a racking business.  Movie Gallery then argued that specific aspects of Greenshields's business, particularly the fact that he acquired several former Movie Gallery customers and the

fact that he was able to develop his business in a matter of weeks and months, indicated that he must have used this confidential information.  Some of the links in this progression of reasoning, however, are more sturdy than others; the result is that Movie Gallery's chain never quite achieves the strength needed to withstand meaningful scrutiny.

Each of the many pieces of this incomplete circumstantial puzzle provided by Movie Gallery has several significant flaws; some are unique and others are shared among them.  It is important to illustrate briefly these major flaws by discussing some of the most important evidence produced at trial.

As a preliminary matter, the evidence establishes that Greenshields was given a great deal of information about Movie Gallery's business.  This included financial information about how Movie Gallery operated its Video Library business.  Importantly, it also included compilations of business customers that contained contact

13

information and valuable account information, detailed financial information concerning revenues and costs, supplier information, product-mix information, and sample lease agreements.   The evidence is not convincing, however, that Greenshields used this information in a significant or improper way.

Movie Gallery places great emphasis on the customer-by-customer information, particularly information about which business customers brought in more revenue and which customers paid bills on time.   However, Movie Gallery failed to produce persuasive evidence that Greenshields actually used that information.   For example, even though Movie Gallery suggested that this information would be critical because it indicated to Greenshields which customers were the most profitable, it did not argue or point to specific evidence that Greenshields actually targeted those customers as opposed to other less profitable ones.[3]   In fact, the evidence

_____

3.   Movie Gallery, through witness testimony, (continued...)

14

showed that Greenshields targeted various customer accounts, including ones that produced only small amounts of revenue. Moreover, Movie Gallery did not argue or show that the customers targeted by Greenshields were those who had higher rates of paying bills on time. Without this connection, the court is not convinced that Greenshields improperly used this confidential information.

Moreover, over half of the accounts developed by Greenshields were not former Movie Gallery business customers, suggesting that instead of simply targeting old Movie Gallery accounts using the profitability details he was given, Greenshields's employees had other methods of selection. They testified that these methods included geographic location and previous personal relationships common in the sales industry. Thus, the

_____

3. (...continued)
acknowledged that it had not even performed detailed profitability calculations on the accounts that it lost, much less compared them to accounts not targeted by Greenshields.

evidence concerning which accounts Greenshields solicited actually suggests that Greenshields was not using the confidential information, particularly the information about profitability or bill payment.

Movie Gallery also argues that it gave Greenshields valuable information about each customer account, including what software program the customer used to manage its video operation and what video-product mix the customer generally had at its store. However, the evidence presented at trial showed that many competing video-management-software programs are easily available on the internet; indeed, Greenshields's employees quickly found a software company online and contracted with that company to provide their new business's customers with a new and, in their belief, better video-management system than the various ones used by Movie Gallery. Therefore, the type of software program used by former Movie Gallery customers, a fact which a customer no doubt could freely disclose to Greenshields anyway, was simply not important

because Greenshields independently researched his own alternative. Moreover, as customer representatives for years, Greenshields's employees had intimate knowledge of product mixes at various locations, as well as built-up knowledge about the kinds of product mixes needed by customers of various sizes and locations. If advanced knowledge of these characteristics is necessary to begin a business--a significant assumption given that such knowledge might easily be acquired through the trial and error inherent in any start-up venture or gleaned from simple surveys of customers--it seems far more likely that the information was garnered from the experience of the employees rather than disseminated to the employees by Greenshields based on information he obtained in the prior confidential negotiations.

Movie Gallery also demonstrated that it provided Greenshields with the location of its video warehouse in Billings Montana, as well as a photograph of the building. Movie Gallery contends that, because

17

Greenshields later leased the warehouse for his company, he must have used confidential information.  The warehouse, however, was publicly available rental property.  More importantly, Smith testified that the landlord of the warehouse was a friend of his.  Because Greenshields's employees--led by Smith--were charged with the every-day management of the business, it is far more plausible that Smith's friendship and personal experience led to Greenshields's rental of the warehouse rather than some desire to capitalize on confidential information given by Movie Gallery.

Movie Gallery also contends that it provided Greenshields with copies of its standard lease agreements with customers.  Movie Gallery argues that, because the lease agreements eventually used by Greenshields contain some substantive similarities with those provided to him, Greenshields must have improperly used confidential information.  On the other hand, Greenshields's employees could easily have gotten one of these lease agreements

18

from a customer and copied it.  Moreover, after working with those agreements for years, the employees may have simply remembered the kinds of terms typical of lease agreements in the racking industry.  The testimony established, however, that the lease agreements were drafted by Greenshields's counsel and not his employees.  There was no testimony that the employees did or did not contribute substantive knowledge to Greenshields's counsel.  Nonetheless, the standard contents of the lease agreements cannot be considered confidential.  They are commonly known among sales representatives in the industry, and any customer is free to disclose the terms to anyone that asks.

Movie Gallery also highlights that it provided Greenshields with a great deal of information about suppliers, invoices, and other aspects of its business that would have been crucial to starting a new company. However, the evidence shows that video-supplier information was readily available on the internet and

well-known in the industry. This highlights a significant flaw in much of Movie Gallery's evidence. Movie Gallery never supported its contention that starting a racking business was particularly difficult or unique. As Greenshields and his employees described the process of beginning the business, it appears very similar to starting any small business, including dealing with suppliers, customers, employment contracts, lease agreements, consumer preferences, revenue flows, and so forth. While starting a business is certainly full of challenges and requires significant skill and dedication, Movie Gallery did not sufficiently support its contention that the video-racking industry was special such that one could not begin a business in the time that Greenshields did without resorting to the use of confidential information.

Perhaps more importantly, Movie Gallery never showed that Greenshields was especially good at the racking business. Movie Gallery asserted that Greenshields was

able to build his business very quickly, but it gave no reference point for comparison. Indeed, Movie Gallery showed that within three months of the rejected sale and within one-and-a-half months of hiring the last of his three employees, Greenshields had transitioned ten former Movie Gallery customers to his new business. Movie Gallery apparently believes that this evidence speaks for itself, but both common sense and the testimony of the field representatives responsible for recruiting new accounts suggest that this number is rather unextraordinary. Indeed, with three employees (all of whom had extensive experience and relationships in the industry, including Smith, who even ran the racking division for Reno before Movie Gallery acquired the division) working all day every day for this considerable time period, the fact that the new business picked up several accounts is not convincing evidence that the owner must have used confidential information. In fact, the testimony of Smith, Kiel, and Plymale demonstrates

21

that, without any specific directions from Greenshields, they continually drove around rural areas in several States and simply solicited customers, some of whom switched and some of whom did not.

This highlights the nature of the racking business, in which many small racking providers are constantly competing for the same pool of business customers. While many of Movie Gallery's customers remained with them for years, many others had left, and Movie Gallery had been losing dozens of accounts prior to Greenshields's presence. Indeed, due to its own strategies (internal emails show that Movie Gallery was not attempting to acquire new rental-racking customers and was losing a significant percentage of its old customers) and the exigencies of the racking market, it continued to lose accounts to providers other than Greenshields at all times relevant to this litigation.

Moreover, a majority of Greenshields's accounts were not former Movie Gallery customers, a fact that undercuts

the allegation that Greenshields was specifically and successfully targeting Movie Gallery customers because of the special knowledge that he had acquired about them.

Furthermore, very little was presented about the financial health of Greenshields's new endeavor, and the total number of accounts his business has accumulated in over a year is just over three dozen. This suggests that Greenshields could have built his business through the normal process of learning and improving through trial and error that accompanies the development of any small business. After all, Greenshields's testimony reveals that one entering the racking business can fairly quickly learn about inventory costs, supplier information, and employee compensation.

The fact that Greenshields may have, through viewing confidential information over the course of several months, become more familiar with the specific accounting and business principles involved in a racking operation surely is not the equivalent of his using specific pieces

of confidential information.  The general knowledge
acquired by Greenshields during the negotiations,
including the information that the business might be
moderately profitable and that Movie Gallery might be
strategically deemphasizing certain aspects of the
business, surely was contemplated by the parties when
they explicitly agreed that they may later become
competitors.  That agreement explicitly contemplated that
Greenshields may compete, and it is only logical that
Movie Gallery could not expect him to rid his mind of
general knowledge acquired through his months of studying
an industry new to him.  Movie Gallery argues that
several pieces of its evidence demonstrate that
Greenshields had a good understanding of its racking
business.  This is entirely unremarkable; a person about
to spend a significant amount of money to buy a business
would be foolish not to understand that business.

Another major flaw common to almost all of the
evidence regarding the confidentiality agreement is that

the evidence at trial strongly suggests that Greenshields himself was very hands-off in the development and operation of the new racking company. Undisputed testimony from all of Greenshields's employees confirms that fact. There is insufficient evidence he ever shared the confidential information with these employees, who were clearly running the company on a day-to-day basis. Movie Gallery even admitted repeatedly with respect to most of the major pieces of evidence that it could not determine if the information it alleged to have been improperly used came from Greenshields through the agreement or, instead, directly from the employees. Thus, this court simply is not convinced that Greenshields breached the confidentiality agreement by improperly using confidential information given to him during negotiations. The court must, however, turn to the issue of what the former Movie Gallery employees knew, what they used, and whether that use was improper under applicable trade-secret laws.

25

B.   State Trade Secrets Laws

Movie Gallery also argues that Greenshields violated
the trade-secrets laws of several States when he used
Movie Gallery's trade secrets to help solicit former
Movie Gallery business customers.   This claim parallels
the breach-of-contract claim except that Movie Gallery's
trade-secrets claim is meant to include trade secrets
obtained by Greenshields through the employees that he
hired and not merely trade secrets and other confidential
information that he was given pursuant to the
confidentiality agreement.   The fates of the two
categories of claims are nonetheless intertwined because,
in making its circumstantial case against Greenshields,
Movie Gallery often does not and cannot distinguish
between the two sources of information.

In analyzing the trade-secret claim, the court must
first determine what law to apply.   Alabama courts apply
the substantive law of the place of injury in tort cases.

<u>Fitts v. Minnesota Mining & Mfg. Co.</u>, 581 So. 2d 819
(Ala. 1991).   Movie Gallery correctly notes that the
place of injury for tort claims involving financial
injury is "the state in which the plaintiff suffered the
economic impact."   See <u>Glass v. Southern Wrecker Sales</u>,
990 F. Supp. 1344, 1348 (M.D. Ala 1998) (Albritton, J.).[4]
Movie Gallery also notes that Greenshields's wrongdoing
has resulted in financial harm in Alabama no matter where
the customers are located.   Thus, the court will apply
Alabama law to the claim that Greenshields's conduct
constituted a misappropriation of trade secrets.   It
should be noted that the parties agree that the relevant
analysis is the same no matter what law is applied, and
the court agrees that the ultimate result would be no

_____

        4.   Moreover, here, the parties agree that Alabama
law should apply to the confidentiality agreement, and
many of the trade-secret allegations are linked with the
claim of breach of contract.

different if it applied the Uniform Trade Secrets Act as adopted by each of the other States at issue.[5]

Movie Gallery divides into multiple categories the putatively misappropriated trade secrets.  The first category includes a laundry list of confidential financial information about the details of Movie Gallery's business, including detailed cost information, supplier pricing, inventory purchasing, and much more. As discussed in detail above, however, Movie Gallery did not show that Greenshields used this information in any way other than in his evaluations of the profitability of Movie Gallery's Video Library division.  Greenshields

_____

5.  Movie Gallery argues that each of the States at issue have adopted the Uniform Trade Secrets Act and that there is therefore "no actual conflict of laws."  Pl.'s Trial Brief at 30 n.13.  Greenshields notes that the Alabama Trade Secrets Act and the Uniform Trade Secrets Act are substantially similar, but he contends in a footnote that the Alabama act is different in at least one respect that, while helpful to him, is not implicated by Movie Gallery's allegations.  As a result, the court need not necessarily resolve the choice-of-law question. See Scott v. Prudential Securities, 141 F.3d 1007, 1012 (11th Cir. 1998) ("We ... need not resolve this choice of law problem because the relevant law in both states is essentially in harmony.").

demonstrated at trial that his nascent racking business was an operation of a very different nature from that of Movie Gallery's much larger division, and much of the disclosed financial information simply would not have been relevant to a startup of Greenshields's size. Greenshields also showed that much of the information about suppliers, costs, inventory, and other information necessary to begin a racking business was easily found on the internet, common knowledge in the racking industry or in any business, or information easily discovered through the trial and error of embarking on a new venture.  Any specific information, such as specific supplier pricing information between Movie Gallery and its individual suppliers (that is, Movie Gallery's account with Ingraham Entertainment) would simply not have been relevant to Greenshields, and there is no evidence that Greenshields used his knowledge of Movie Gallery's specific supplier-pricing information.

29

Other information listed by Movie Gallery includes employee-payroll information and a copy of the lease agreement for Movie Gallery's warehouse in Billings, Montana.  Movie Gallery suggests that Greenshields used the employee information in order to know how much to offer former Movie Gallery employees.  However, the evidence at trial showed that those employees approached Greenshields and, regardless, those employees negotiated their salaries with Greenshields.  They were themselves open about their salaries at Movie Gallery and even suggested that they would be willing to take less salary to begin working for Greenshields.  As noted earlier, the location of the Billings warehouse was surely public knowledge, and it is hard to argue that even were it confidential, it would be a trade secret.  In any case, Greenshields's later rental of that same space probably has more to do with Smith's friendship with the landlord than with a misappropriation of trade secrets.

30

Movie Gallery has simply failed to convince the court that any of this financial information, even if it were considered a trade secret, was used improperly by Greenshields.

A second category of allegedly misappropriated trade secrets is more complicated. Movie Gallery alleges that it and, later, its former employees, gave detailed customer lists and other customer information to Greenshields. Greenshields counters that this information does not qualify as a trade secret and, even if it did, Greenshields did not use it and Movie Gallery suffered no damages.

Greenshields's contention that the detailed customer lists were not trade secrets is clearly incorrect.[6] The

_____

6. Greenshields contends that the customer lists were made publicly available in bankruptcy filings. However, these filings occurred months after the alleged misappropriation and, more importantly, the publicly available information was of a wholly different nature. The information Greenshields obtained from Movie Gallery was far more detailed than what was made publicly available; it included organized compilations of customers, as well as detailed information about each
(continued...)

Alabama Supreme Court has stated that "it is undisputed
... that customer lists may ... be afforded the
protection of a trade secret." Public Systems, Inc. v.
Towry, 587 So. 2d 969, 973 (Ala. 1991) (finding that
protection is afforded to compilations that are not just
lists, but that "contain[] specific information about

---

6.  (...continued)
customer, including revenues, locations, phone numbers,
software programs used, identity of the supervising
account representative, product mix, and other valuable
information.

Greenshields also contends that copies of customer-
lease agreements are freely obtainable by asking
individual customers.  Thus, one could determine who
Movie Gallery's customers were and obtain much of the
information about that account simply by speaking with
each customer.  However, these customers are independent
stores spread out over thousands of miles in many States,
and the compilation of all of this information into
several documents and computer files represents years of
work.  This is precisely the kind of valuable,
confidential, compiled data that can constitute a trade
secret, even if it would be physically possible to
eventually recreate the information from publicly
available information.  Moreover, there is no assurance
that an individual customer would choose to reveal the
details of its contract with Movie Gallery, particularly
because, as Movie Gallery's witnesses testified, it might
be against the business interests of the customer to
reveal the terms of its contract with Movie Gallery.

customers, for example, their buying habits"). The
customer lists at issue here contained a great deal of
information, including the buying habits of Movie
Gallery's customers. Additionally, the compiled-customer
information meets all of other the requirements of a
"trade secret" as defined by 1975 Ala. Code § 8-27-2.
This information was not generally known in the industry
because it was created and developed by Movie Gallery and
was specific to the clients and customers of its Video
Library business.  It was not readily derivable from
public information because it contained detailed and
valuable compilations of information from hundreds of
small rural stores over thousands of miles; even if one
visited the stores and was able to obtain some
information from the owner, the internal Movie Gallery
information pertaining to each customer would still be
confidential. See Unisource Worldwide v. South Central
Alabama Supply, LLC, 190 F. Supp.2d 1194, 1209-10 (M.D.
Ala. 2001) (Dement, J.) (finding customer histories and

price lists to be trade secrets under Alabama law).
Moreover, Movie Gallery took reasonable steps to keep
this information confidential by requiring employees to
sign ethics policies acknowledging that they would not
reveal the information, by password protecting the
computer systems that stored the information, and by
entering into confidentiality agreements (like the one
with Greenshields) whenever that information was
disseminated to a potential competitor. Therefore, under
well-settled principles of trade-secrets law, this
information constitutes a trade secret.

Because the detailed customer lists were trade
secrets, the court must now turn to whether Greenshields
misappropriated them under 1975 Ala. Code § 8-27-3. As
noted above, much of the evidence suggests that
Greenshields was not using trade secrets specifically to
target Movie Gallery customers or specifically to target
certain more profitable Movie Gallery customers.
Contrary to Movie Gallery's vague pretrial assertions,

34

the evidence presented at trial did not show that the employees ever physically took any tangible information to their new employer.

Nonetheless, it is undeniably clear from the documentary evidence and testimony at trial that Greenshields's employees used their experience within the industry, relationships with customers and potential customers acquired at Movie Gallery and at previous employers, and specific knowledge about Movie Gallery's business relationships to help Greenshields develop a competing business. Movie Gallery asks this court to declare this conduct to be a violation of the Alabama Trade Secrets Act.

Even though it lumps allegations of employee use of experience and knowledge together with its customer-list contention, Movie Gallery has not shown that these employees used the compilations of information that this court has found to be trade secrets. Instead, at best, Movie Gallery has shown (indeed, the employees have

35

admitted) that they used information about individual customers, relationships they had built, and general knowledge about the racking industry acquired before and during their time with Movie Gallery. This is a crucial distinction. While compilations and detailed customer lists are properly viewed as trade secrets, a salesperson's built-up goodwill and relationships are not. Moreover, Movie Gallery has not made a showing that its former employees utilized or brought to their new employer any of the larger compilations. Similarly, individual, customer-by-customer information is not properly considered a trade secret in the way that large compilations of the same information are. First, much of the value of the larger lists is that they are not easily or quickly created. Second, the most important individual-customer information that would have been useful to Greenshields and his employees (such as lease terms, revenue, or product mix) would be available from the customer, particularly if the customer had a previous

relationship with a given sales representative. As evidenced by the testimony at trial, the individual information making up the larger compilations was often not confidential because the customer was free to reveal the information. Thus, because of their previous relationships over several years, customers may very easily have given this information to Greenshields's employees. There is not sufficient evidence that the employees used or obtained customer information in any other way.

More fundamentally, if the court were to adopt Movie Gallery's interpretation of state trade-secrets law, then these employees would essentially be barred from working again for another company in the industry. Achieving such a result through trade secrets law would drastically expand the scope of the Alabama statute. (Movie Gallery's own former general counsel acknowledged that it would be unreasonable to restrict salespersons from using their former relationships with customers and potential

customers when they switch employers.)  Movie Gallery's

argument is, at its heart, a contention that because

these employees knew so much about their clients and

customers when they were employed for Movie Gallery, they

were forbidden from going to work for a competitor

because in so doing they would be unable to function

without relying on the trade secrets that they knew.[7]

Indeed, it is telling that Movie Gallery argues that the

employees "certainly could not erase such knowledge when

their employment with Movie Gallery terminated."  Pl.'s

Annotated Timeline of Trial Exhibits, at 23.    Movie

Gallery even argued at trial that this prohibition should

_____

     7.  Movie Gallery curiously argues that this is not
simply a case of a few salespeople leaving to join a
competitor.  Pl.'s Trial Brief at 40.  Apparently, Movie
Gallery recognizes the absurdity of arguing that the
Alabama Trade Secrets Act would prevent such a routine
migration.  Instead, Movie Gallery argues that this is a
case involving "crucial" employees of a "specialized"
business.  As noted throughout this opinion, these vague
allegations about the "special" nature of the racking
business are largely unsupported or contradicted.  The
employees involved, even Smith, essentially acted as
salespeople.  While they were certainly "crucial" for
Greenshields's startup, nothing about that fact makes
them guilty of misappropriating trade secrets.

38

be permanent.  If Movie Gallery wants to attempt such a drastic restriction on the livelihoods of its former employees, it could consider having them contract not to compete, although, as noted later, such agreements are generally disfavored as against the public policy of Alabama.  Movie Gallery does not contend that these employees lawfully contracted to give up their rights to work for competitors, and this court will not interpret state trade-secret law to create such a right.

There is good reason to believe that Alabama courts allow former employees to bring with them to their new jobs confidential information that they can remember. Otherwise, it would be very difficult for employees to ever change jobs.  The common-law approach in Alabama allowed this distinction between trade secrets and mere customer information retained from an employee's experiences.  See Gilmore Industries v. Ridge Instrument Co., 258 So. 2d 55, 59 (Ala. 1972) ("Simply because an agent has seen confidential data during the term of an

39

agency does not mean that after termination of the agency the agent is precluded from competing with his former principal, even though confidential knowledge gained during the agency may be of use in forwarding the competitive position of the agent."). The Georgia Supreme Court has strongly adhered to this common-law principle even after the adoption of the Uniform Trade Secrets Act in Georgia. See Manuel v. Convergys Corp., 430 F.3d 1132 (11th Cir. 2005) (citing Avnet, Inc. v. Wyle Laboratories, Inc., 437 S.E.2d 302 (Ga. 1993)).

There is also good reason to believe that the old common-law distinction is still alive and well in Alabama with respect to customer and business information after the passage of the Alabama Trade Secrets Act. See Randall Scott Hetrick, Employee "Head Knowledge" and the Alabama Trade Secrets Act, 47 ALA. L. REV. 513 (1996). As a result, the fact that Movie Gallery never proved that the employees used anything other than the knowledge and relationships gained from their experience in the

industry is an independent basis for finding that Movie Gallery cannot prevail on its trade-secrets claim under Alabama law.

A helpful example of these broader issues is Movie Gallery's specific allegation that Smith and Greenshields misappropriated trade secrets in their unsuccessful solicitation of Movie Gallery's Alaska accounts. Movie Gallery asserts that Greenshields must have misappropriated trade secrets because otherwise he would not have known to offer Smith a bonus for transitioning the large Alaska accounts. Greenshields argues that the identity of the big Alaska accounts is widely known in the industry. Regardless, the Alaska accounts were certainly known to Smith, who testified that he proposed the bonus because he thought he might be able to transition the account and because he wanted some potential for extra money because he was taking a pay cut by going to work for Greenshields.[8] Movie Gallery

_____

8. Smith testified that he was concerned about his
(continued...)

highlights an email in which Smith used information about the Alaska accounts, including software, revenue, and inventory management procedures.     Pl.'s  Ex.  136. However,  Smith  obviously  would  have  known  that information about one of his biggest individual clients at Movie Gallery and, more importantly, the evidence at trial suggested Smith was merely responding in that email to earlier conversations and statements from the customer that likely identified all of the relevant and putatively secret information.   Because the customer was free to reveal all of this information to Smith as he attempted to convince it that he was offering a better product, Movie Gallery cannot claim that this information is a trade secret.

---

    8.   (...continued)
future at Movie Gallery because the company had reduced by  over  50%  the  number  of  employees  in  the  racking division and taken other actions--such as prohibiting the solicitation  of  new  customers  and  cutting  back  on marketing--that suggested that the business was no longer a priority.

The trade-secret claim therefore comes down to what kind of information the former employees should be allowed to take to their new employer.  Because the kind of information used by Greenshields's employees was linked only to several individual customers and based on previous personal relationships and experience, Movie Gallery has not convinced the court that Greenshields (and his employees) misappropriated its trade secrets.

C.  Intentional Interference with Business Relations

1.  Customer Interference

Movie Gallery argues that Greenshields intentionally interfered with its business and contractual relationships with its business customers when it entered the racking business and solicited Movie Gallery customers, successfully convincing several of them to switch racking providers and forcing Movie Gallery to devote resources to retaining accounts that otherwise

43

would have renewed their relationship with Movie Gallery without incident.[9]

Both parties agree that Alabama law applies to this claim. Nonetheless, they have each emphasized different features of Alabama doctrine and drawn the court's attention to different lines of cases. These differing approaches are understandable given that Alabama law in

_____

9. Count III of the amended complaint asserts that Greenshields: (1) interfered with Movie Gallery's relationships with its customers and (2) interfered with Movie Gallery's relationship with Smith. Similarly, Movie Gallery's proposed findings of fact and conclusions of law addresses these same two contentions. However, in its trial brief, Movie Gallery now argues in addition that Greenshields tortiously interfered with its employment relationships with its other employees. Greenshields in his trial brief addressed only the two allegations in the complaint. The court therefore does not view this issue concerning interference with other employees as properly before it. Even if it were, Movie Gallery simply did not show that these employees breached any duty to the company, much less show that Greenshields improperly induced such a breach. The mere fact that they signed employment agreements with a new employer several days prior to officially terminating their employment with Movie Gallery simply cannot rise to the level of actionable conduct. Indeed, it seems normal and prudent for an employee (particularly an at-will one) to insure herself of her next job prior to leaving her current one--a fact recognized by Movie Gallery's own witnesses.

this area is, at best, confusing and contradictory. Indeed, Alabama courts themselves have pointed out this fact.  See Gross v. Lowder Realty Better Homes & Gardens, 494 So. 2d 590, 596 (Ala. 1986) (noting that the state law of this tort is marked by "obvious confusion" and is "inconsistent").   In fact, even though the Alabama Supreme Court attempted in Lowder to provide some consistency, subsequent decisions have added requirements that seem inconsistent with Lowder's discussion of the tort's history.

Whatever this court's thoughts on the wisdom of recent Alabama cases on this subject, the recent cases have been fairly clear.  Lowder outlined the basic elements of the tort: (1) existence of contract or business relationship, (2) defendant's knowledge of that relationship, (3) intentional interference, (4) absence of justification (which is an affirmative defense), and (5) damage to the plaintiff.  Lowder, 494 So. 2d at 597. Several more recent Alabama cases have, however, added an

45

additional element: the use of "fraud, force, or coercion" by the defendant.  Joe Cooper & Associates v. Central Life Assurance Co., 614 So2d 982 (Ala. 1992); Barber v. Business Products Center, 677 So. 2d 223, 227 (Ala. 1996); see also United States Steel v. Tieco, 261 F.3d 1275, 1292 (11th Cir. 2001).[10]

It is clear here that Greenshields did not engage in any fraud, force, or coercion.  While Movie Gallery argues that Greenshields's conduct was wrongful and illegal, it does not attempt to argue that it was fraudulent, coercive, or aided by force.[11]  As a result,

_____

10.  The source of this additional element appears to be several prior Fifth Circuit opinions purporting to have interpreted Alabama law.  While the Fifth Circuit's analysis appears to have misunderstood the history of the tort in Alabama--indeed the Fifth Circuit cases relied on by Joe Cooper were decided before Lowder--the Alabama Supreme Court in Joe Cooper seems to have adopted their conclusion that fraud, force, or coercion is required. This court is bound to follow that conclusion even if it finds recent Alabama Supreme Court precedent logically flawed and historically inaccurate.

11.  Movie Gallery did not argue at trial (and did not attempt to provide evidence) that Greenshields's conduct involved fraud, force, or coercion.  This is likely (continued...)

46

Movie Gallery cannot establish the required elements of the tort, and the court need not address the parties' arguments about the affirmative defense of justification.[12]

------------------------

11. (...continued)
because Movie Gallery ignored in its trial brief these recent cases that make that kind of conduct a necessary element of the tort. Instead, Movie Gallery devoted its energy to showing that Greenshields's conduct was "wrongful" in order to show that, in Alabama, the affirmative defenses that Greenshields attempted to plead were unavailable. Whatever the merits of this argument, it appears that Alabama courts have changed the law in Greenshields's favor.

12. Prior to Lowder, the torts of interference with business relations and interference with contracts were separate. Lowder abolished this distinction and created a single set of broadly defined elements. Lowder, 494 So. 2d, at 597. Even though both the Alabama Supreme Court in Lowder and the Fifth Circuit in the cases relied on by Joe Cooper recognize that fraud, force, or coercion was not required for the tort of interfering with business relations or for many forms of contractual interference, subsequent law clearly requires that fraud, force, or coercion be proven for any violation of the now-combined tort, whether it be interference with a contract or a business relationship. Joe Cooper, 614 So. 2d at 986.

## 2.  The Smith Agreement

In 1999, Smith signed a "Non Solicitation & Confidentiality Agreement" with Video Library.  The agreement purported to prevent Smith from disclosing Video Library's trade secrets and from soliciting its employees or customers for a period of two years after the termination of his employment. Pl.'s. Ex. 10.  Movie Gallery claims that Greenshields knowingly induced Smith to break his employment agreement.  Assuming Movie Gallery could prove each element of a tortious-interference claim (a highly unlikely assumption--at least if Alabama law applies--given the facts of the case and the above analysis concerning fraud, force, or coercion), The claim still hinges on whether the Smith agreement is enforceable.

At first, it is worth noting without the shackles of legal jargon exactly what Movie Gallery is asking of this court.  Movie Gallery seeks to recover money by using Alabama law to enforce a contract that was entered into

**48**

in Montana by a Montana company and a Montana resident in 1999.    Not  only  is  this  contract  indisputably unenforceable  in  Montana,  but  it  was  clearly unenforceable at the time it was signed--a fact that even the people agreeing to the contract acknowledged.  (Reno, the President of Video Library (before it was purchased by Movie Gallery), told Smith that he should sign the contract even though it was unenforceable simply as a way of setting an example for other employees concerning loyalty to the company.)

That being said, the court can now return to the jargon.  The Smith agreement contains both a Montana forum-selection clause[13] and a Montana choice-of-law provision.[14]  The parties agree that this contract would

_____

13. The  parties  dispute  the  relevance  of  this provision.  Movie Gallery argues that it is irrelevant because Smith himself is not being sued pursuant to the agreement and because Greenshields has "not sought to enforce this provision in any way" throughout the course of this litigation.  The court finds it unnecessary to resolve this dispute.

14. The provision reads: "This Agreement shall be
(continued...)

be unenforceable in Montana because no new consideration was given at the time of signing and because Montana disfavors non-competition agreements, particularly those with a scope as large as the Smith agreement.

Movie Gallery nonetheless argues that Alabama law should apply and that Alabama would enforce the Smith agreement.   The Alabama Supreme Court has noted that Alabama follows the law agreed upon by the parties or, in the absence of such an agreement, the law of the State in which the contract was formed.   Stovall v. Universal Construction, 893 So. 2d 1090, 1102 (Ala. 2004).   The exception to these rules is that Alabama courts, following the Restatement Second of Conflict of Laws §§ 187 and 188, will not enforce a contract that is contrary to the fundamental policy of the forum state if the forum state has a materially greater interest in the determination of the issue.   Cherry, Bekaert & Holland v.

_____

14. (...continued)
governed as to its validity, content and effect by the laws of the State of Montana."  Pl.'s Ex. 10.

Brown, 582 So. 2d 502, 506 (Ala. 1991).[15]  A dispositive
issue here, then, is whether the fundamental policies of
Montana and Alabama implicated by the Smith agreement are
in significant conflict.[16]

_____

15. When parties have chosen a different State's law
and that law is contrary to fundamental policy, at least
one court has held that the fall-back position is
apparently not Alabama's usual principle of lex loci
contractus.  Instead, Alabama courts are said to apply
§ 188, which is a more holistic analysis of the
connection between the transaction and various States.
See Unisource Worldwide, Inc. v. South Central Alabama
Supply, LLC, 199 F. Supp.2d 1194, 1201 (M.D. Ala. 2001)
(Dement, J.).  Movie Gallery argues that this
interpretation means that Alabama law should be the fall-
back law here.  If this interpretation of ambiguous
Alabama law is incorrect and Montana law would be the
default pursuant to lex loci contractus, Alabama courts
would still engage in the fundamental-policy test (as if
the parties had not chosen invalid state law).  See
Stovall, 893 So. 2d at 1102.  Thus, the dispositive
question is whether there exists a fundamental conflict
between the application of the two States' laws
regardless of whether the Unisource interpretation of
ambiguous Alabama law and Movie Gallery's subsequent
application of this law to the facts are correct.

16. Because the court finds that application of
Montana law is not fundamentally in conflict with Alabama
law, it need not decide whether Alabama has a materially
greater interest in having its law applied.

A careful examination of the laws of both States indicates that they are not.  In order for a policy to be fundamental, it must be "substantial."  The Alabama Supreme Court has noted that Alabama courts "will not refrain from applying the chosen law merely because this would lead to a different result than would be obtained under the local law."  <u>Cherry</u>, 582 So. 2d at 507.

As a preliminary matter, the Smith agreement is unenforceable in Montana because no new consideration was paid at the time of signing.  <u>See</u> <u>Access Organics Inc. v. Hernandez</u>, 175 P.3d 899, 904 (Mont. 2008) (noting that because the employee and employer are not on equal bargaining ground, "in the context of non-compete agreements with existing employees, we require clear evidence that the employee received good consideration").  Movie Gallery argues that Alabama courts have applied a contrary rule, allowing continued employment and compensation to serve as consideration.  <u>See</u> <u>Corson v. Universal Door Systems Inc.</u>, 596 So. 2d 565, 568 (Ala.

2001).   Movie Gallery is (not surprisingly) unable to offer any argument, however, that this putative difference between the States in which non-compete agreements are enforceable is "fundamental."

Movie Gallery instead argues that "one would be hard pressed to find a recent case in which a Montana court has enforced a covenant not to compete."   Pl.'s Trial Brief at 55.   This argument is apparently suggesting that the actual law in Montana diverges from the standard that Montana courts ostensibly apply.   But a supposedly more strict application of a similar standard simply cannot be the ground for suggesting that the laws of the two States are fundamentally opposed to each other, particularly when the legislatures and courts of both States have explicitly indicated that they strongly disfavor any contracts restraining employment.

Movie Gallery tries to get around this clear difficulty by characterizing the Smith agreement as a "confidentiality agreement," apparently assuming that the

court could find the portions of the agreement related to confidentiality enforceable even if the portions relating to non-solicitation appear more like a non-compete agreement. Movie Gallery argues that Alabama courts would not apply many of the strict requirements for non-compete agreements to confidentiality agreements, and because Montana treats confidentiality agreements as void unless the restraint is reasonable in time and place, the laws of the two States are in fundamental opposition. A problem with this approach, however, is that Movie Gallery itself admits that Alabama "disfavors contracts restraining employment" and does not cite to a single Alabama case that holds that confidentiality agreements should be treated differently from non-compete agreements.[17] Movie Gallery asks this court, then, in the

---

17. Indeed, Movie Gallery points to a federal court opinion which treats the two agreements the same under Alabama law but criticizes that case for having cited no law for that proposition. See Warranty Corp., Inc. v. Hans, at *5 (S.D. Ala. March 9, 2000) (Steele, M.J.). Movie Gallery also cites to Montana law, which also does not distinguish in important aspects between the two (continued...)

absence of a statement from Alabama courts on the issue,
to hold that, even though Alabama strongly disfavors
contracts restraining employment, the refusal of another
State to enforce a confidentiality agreement whereby a
corporation seeks to restrict the activities of employees
is so harsh that it fundamentally offends even the
Alabama policy.[18]

_____

    17. (...continued)
types of employment restraints.  See State Med. Oxygen
and Supply v. American Med. Oxygen Co., 782 P.2d 1272,
1275 (Mont. 1989).

    18. Instead, Movie Gallery offers some policy
arguments designed to show how dangerous Montana's
approach would be if extended to confidentiality
agreements in Alabama.  According to Movie Gallery,
because Montana requires some limitation to the
restrictions placed on employees (such as length of time
or geographical region), the consequences would be
devastating to Alabama corporations as they try to retain
their confidential information.  Movie Gallery cites to
the Alabama Trade Secrets Act as evidence of the State's
strong desire to protect confidential information.
However, none of these arguments suggests why Montana's
policy of requiring consideration is contrary to
fundamental policy.  Moreover, these arguments suggest
that Alabama corporations are already protected by other
statutes without the need to bind employees to contracts
that may, due to unequal bargaining power, expand the
scope of protected information well beyond that
                                        (continued...)

Alabama courts have found that Alabama's strong policy <u>against</u> non-compete covenants is fundamental. <u>See</u> <u>Cherry</u>, 582 So. 2d at 507 ("This Court finds that Alabama's policy against covenants not to compete is a fundamental public policy."); <u>Blalock v. Perfect</u> <u>Subscription Co.</u>, 458 F. Supp. 123, 127 (S.D. Ala. 1978) (Hand, J.) (noting that a covenant not to compete "flies directly in the face of the public policy of Alabama"). While this is not logically inconsistent with the result urged by Movie Gallery, it is certainly strongly suggestive of the high hurdle that Movie Gallery must climb in convincing this court to find that another

_____

18. (...continued)
information protected by Alabama trade-secrets laws. Furthermore, Montana has adopted the Uniform Trade Secrets Act, and Movie Gallery makes no attempt to distinguish between the laws applicable to trade secrets in the two States, suggesting that it may be possible to enact laws protective of trade secrets while at the same time discouraging restrictive employment contracts to the degree that Montana does.

56

State's policy against similar agreements is so draconian
that it goes so far past Alabama's in a fundamental way.[19]

The court need not make this determination because it
finds that Montana's requirement of new
consideration--which the parties agreed applied to the
Smith agreement--is not in material conflict with
fundamental Alabama policy.  This determination rests, at

---

19. Movie Gallery relies extensively on the federal
district court decisions in Unisource and Benchmark Med.
Holdings v. Rehab Solutions, 307 F. Supp.2d 1249 (M.D.
Ala. 2004) (Albritton, J.).  Both cases, however,
recognize that the Blalock case is the source of their
analysis because the Alabama Supreme Court has expressly
adopted Blalock.  Neither Unicource nor Benchmark,
however, involved the issue here: whether a policy
requiring additional consideration is fundamental.  In
Benchmark, as in Blalock, the court found that Alabama
will not enforce covenants not to compete against an
Alabama resident if that covenant is void under Alabama
law.  In Unisource, the court found Florida law too
accepting of non-compete agreements compared to Alabama
law and decided to apply Alabama law.  However, the court
applied Alabama law to enforce the agreement anyway--a
result apparently consistent with Florida law.  Thus, it
is not clear how the application of the parties' chosen
law could have resulted in an outcome in tension with the
fundamental policies of Alabama.  Thus, neither case
deals with the situation here: an Alabama corporation
seeking to enforce an agreement that restrains an
employee when the law of the chosen state is potentially
more hostile to such agreements than Alabama's.

its heart, on whether it is against fundamental Alabama policy to require a corporation to give new consideration to an employee when the employer makes additional demands on that employee. Even if Alabama courts would enforce such a contract based on the consideration of continued employment, nothing in Alabama's stated policies suggests that a contrary result would be offensive to fundamental Alabama principles. See Cherry, 582 SO.2d at 507 (noting that fundamental policies may be embodied by laws that make certain "kinds of contracts illegal or which [are] designed to protect a person against the oppressive use of superior bargaining power") (citing the Restatement § 187 cmt.).

Thus, because Montana law applies to the Smith agreement and because the contract is unenforceable in Montana, there is no valid contract upon which to base a claim of tortious interference with a contract regardless of what State's law applies to that common-law claim.[20]

_____

20. Movie Gallery argues that Alabama law should (continued...)

### D.   Lanham Act

To prevail under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), Movie Gallery must show that (1) it had a prior right to the VIDEO LIBRARY mark and (2) Greenshields adopted that mark or a mark confusingly similar such that consumers were likely to confuse them. See Conagra Inc. v. Singleton, 743 F.2d 1508, 1512 (11th Cir. 1984).  The real dispute between the parties here centers on the likelihood of confusion.[21]  The parties also agree that the seven-factor test applied in Frehling Enterprises v. Int'l Select Group, 192 F.3d 1330, 1335 (11th Cir. 1999) governs this dispute.  These factors

─────────────────

20.  (...continued) apply to this common-law tortious-interference claim and Greenshields apparently agrees.  Indeed, no effort is made to distinguish the claim of tortious interference with the Smith agreement from that of tortious interference with Movie Gallery's customers, at least in this respect.  Thus, as noted earlier, the lack of fraud, force, or coercion would be an independent basis for Movie Gallery's inability to prevail on its claim.

21. Movie Gallery produced extensive evidence at trial that Movie Gallery and its predecessors had used the VIDEO LIBRARY mark in commerce long before Greenshields, a fact that Greenshields does not dispute.

include (1) the type of mark, (2) the similarity between the marks used, (3) the similarity of the products represented by the marks, (4) the similarity of the parties' retail outlets and customers, (5) the similarity of advertising media, (6) defendant's intent, and (7) actual confusion.  <u>Id</u>.  "Of these, the type of mark and the evidence of actual confusion are the most important."  <u>Id</u>.

The analysis and weighing of these seven categories present a close case here because important factors point in the direction of each party.  With respect to the first factor--the type of mark--the parties agree that there are four categories of marks that receive descending levels of protection: arbitrary or fanciful marks, suggestive marks, descriptive marks, and generic marks.  <u>Dieter v. B & H Industries of Southwest Florida</u>, 880 F.2d 322, 327-28 (11th Cir. 1989).  The parties also agree that the mark will receive protection if it is considered "suggestive," but not if it is "descriptive,"

unless that descriptive mark has, through time and use, developed "secondary meaning."

Movie Gallery urges that the VIDEO LIBRARY mark is "suggestive" and not merely "descriptive." The parties do not offer differing legal analyses of the meaning of these terms or the standards used in determining them. The Eleventh Circuit has stated: "Descriptive marks directly describe a characteristic or quality of the service [or product], and can only be protected if they have acquired 'secondary meaning.' 'Vision Center,' when used to describe a place to purchase eyeglasses, would be a descriptive name. Suggestive marks subtly connote something about the service [or product] so that a consumer could use his or her imagination and determine the nature of the service [or product]. The term 'Penguin' would be suggestive of refrigerators." Freedom Savings and Loan Assoc. v. Way, 757 F.2d 1176, 1182 n. 5 (11th Cir. 1985).

This court is of the opinion that the mark VIDEO LIBRARY is descriptive in nature.[22]  While not literally a library in all respects, the service that the mark describes includes collections of movies that are on display and lent out to would-be viewers.  The term suggests a library of videos, which plainly describes a "characteristic" of the service provided by Movie Gallery.  The connection between this service and the terminology used to describe it is simply not subtle enough to render it "suggestive."  In other words, it is more like "Vision Center" than like "Penguin."

Nonetheless, the court finds that Movie Gallery has established a secondary meaning in the VIDEO LIBRARY mark in the relevant markets.  See Conagra, 743 F.2d at 1513 (listing factors to be considered in determining secondary meaning).  Video Library and Movie Gallery had used the VIDEO LIBRARY mark in the racking business for

_____

22. While the United States Patent and Trademark Office may not have had the same evidence before it as this court does, it also found the mark to be descriptive.

62

years, and they advertised it in many different media. The mark was used in communications and lease agreements with stores and placed on racks and flyers in them for years, establishing a significant reputation in the racking business in the 14 States within which the racking business operated. Moreover, Greenshields himself thought that the mark was quite important, going out of his way to make sure that transfer of the mark and all of its benefits were explicitly included in the proposed sale of the racking division; Greenshields even insisted on a separate document that would ensure the assignment of that right. Indeed, this was even a major sticking point for Greenshields at one time in the negotiation process. The fact that Greenshields thought the mark was valuable is evidence that it had obtained a secondary meaning in the relevant community.

Also important in the analysis about the type of mark is the degree to which third-parties make use of the mark; the fewer that use it the stronger the mark. See

**Frehling**, 192 F.3d at 1336.   Greendhields presented evidence to show that several companies available via a simple online search employ the term "Video Library" around the country.   Movie Gallery established at trial, however, that even though many people have used the mark, they were the sole users of the mark in the geographical area relevant to this suit.   In particular, it was the sole user in the racking business, and this fact lends strength to the mark.

Factors two through five all point strongly in favor of Movie Gallery.   The mark, customers, product, services, and advertising media used by Movie Gallery (and its predecessors) and Greenshields were all identical or virtually identical.

Factor six, as discussed briefly above, also points in favor of Movie Gallery.   Greenshields applied for registration of the mark and, unbelievably, indicated to the United States Patent and Trademark Office that he was unaware of anyone else who may have a right to the mark.

64

This is particularly troubling given Greenshields's continued insistence throughout purchase negotiations that he receive the right to the mark. Moreover, Smith used an email address with the term "vidlib" in its title after he left Movie Gallery and began soliciting customers for Greenshields. This decision is indicative of Smith and Greenshields's belief that the VIDEO LIBRARY mark was certainly recognizable. Greenshields began using the VIDEO LIBRARY mark on several lease agreements with customers, and the papers indicated that his company was doing business as "Video Library." Because Greenshields knew that Movie Gallery had been using the mark in commerce for years; because Greenshields and his employees began using the identical mark in commerce even after the proposed sale was rejected; and because Greenshields apparently had a strong desire to acquire the right to the mark, the evidence supports the conclusion that Greenshields knowingly attempted to

infringe on the mark for his own benefit and to the detriment of Movie Gallery.[23]

This conclusion is potentially important not just because it can establish secondary meaning under the first <u>Frehling</u> factor, but also because some courts have found the intent to infringe to be so important that it could create a rebuttable presumption of confusing similarity and alone could be enough evidence of likelihood of confusion.  See <u>Babbit Electronics v. Dynascan</u>, 38 F.3d 1161, 1179 (11th Cir. 1994) ("[A] likelihood of confusion can be found as a matter of law if the defendant intended to derive benefit from the plaintiff's trademark."); <u>Bauer Lamp Co. v. Shaffer</u>, 941 F.2d 1165, 1172 (11th Cir. 1991) ("Intent to copy itself

_____

23. Greenshields at one point testified that he was registering and using the mark only because he thought the sale would eventually go through once he paid more money.  This testimony is not credible given the complete lack of further negotiations between the parties and, more importantly, Greenshields's representation to the registration office that he was the only person with any sort of claim to the mark.

creates a rebuttable presumption of likelihood of confusion.").

The final factor--the degree of actual confusion--indisputably points in favor of Greenshields. See Frehling at 1335 (noting that the type of mark and evidence of actual confusion are the most important factors); Dieter, 880 F.2d at 322 (same). Not only did Movie Gallery not put forth any evidence of customer or consumer confusion, but both Greenshields's employees and Movie Gallery explicitly informed potential customers that the two were different entities. Movie Gallery informed its customers that Smith and his associates were no longer part of their Video Library division. Moreover, Greenshields was trying to take business away from Movie Gallery, and this process often involved highlighting the negative aspects of Movie Gallery's Video Library division to potential customers. In fact, very shortly after using the VIDEO LIBRARY mark, Greenshields's employees independently decided to stop

67

using it.[24]  It is telling that Movie Gallery was not able
to find a single customer or potential customer who was
confused by the Greenshields's brief use of the mark.

Thus, most of the seven factors point in favor of
Movie Gallery.  Nonetheless, as the Eleventh Circuit has
noted, the court must remember that the "bottom line" in
these cases is really the likelihood of confusion.
Custom Manufacturing & Engineering v. Midway Services,
509 F.3d 641, 649 (11th Cir. 2007).  As a result, the
seven-factor test is not meant to be a "mechanistic
summation" in which the court tallies the total number of
factors favoring each party.  Id.  The relative strength
of each factor is obviously important as the court
examines the evidence and context to come to its best

_____

    24.  Even if the VIDEO LIBRARY mark were to remain on
the seven lease agreements on which it was first used,
Greenshields completely ceased actively using the mark.
The fact that those leases may not have been amended to
remove the mark does not change any of the analysis here.
Those customers are surely well aware that they are
dealing with Greenshields and not Movie Gallery, and
Greenshields has not been using the mark in any other
fashion.

judgment on this bottom-line question in the particular circumstances presented by a given case.

Moreover, in addition to the seven factors, the court should take into account factors unique to each case. Id. at 650.   In this case, the case-specific facts undeniably and strongly point in favor of Greenshields. For example, the stores at issue are likely much more sophisticated than ordinary consumers.   Greenshields points out that the stores are themselves businesses that are deciding whether to enter into long-term contracts with competing racking providers.   They are likely to know with whom they are dealing and are less likely to be confused by superficially similar marks.   On the other hand, some potential customers in the racking business are small rural stores considering getting into the business for the first time, and they may be only casually familiar with some of the major players in the business.   The court is therefore not convinced that it would be unlikely or unreasonable for some of these

customers to experience some confusion when confronted with multiple uses of the VIDEO LIBRARY mark.  Even so, Greenshields's use of the mark was so limited that there is no evidence that any of these less sophisticated customers were ever exposed to it.

Of crucial importance, each of the seven customers with which Greenshields used the VIDEO LIBRARY mark was a former Movie Gallery customer.  These stores were told explicitly by both parties that the two competing entities were distinct, and the likelihood of confusion among these customers is almost nonexistent given their experience with racking and given the context within which they were approached by Greenshields to switch their allegiance.  The unique attributes of this case therefore suggest that, even though important factors tilt in each direction, there was no meaningful likelihood of confusion because of the way the mark was used, the extent of its use, and with whom it was used.

This is indeed a strange case of trademark infringement. There is clear evidence of an intent to infringe, but also convincing evidence that Greenshields and his employees soon discovered that a more appropriate strategy was distancing themselves as much as possible from Movie Gallery's Video Library name. The intentional infringement is simply difficult to reconcile with all of the evidence about the deteriorating state of Movie Gallery's Video Library division and the business model and strategy that Greenshields quickly adopted; after all, perhaps that explains why the use of the mark was so ephemeral.

Greenshields correctly points out that the use of the VIDEO LIBRARY mark was not only short-lived (they ceased using it after only a few weeks), but it was also extremely limited: it occurred on a total of seven boilerplate lease agreements drafted by Greenshields's account representatives and his lawyer, but nowhere in Greenshields's advertising, brochures, or sales

71

literature given to potential customers.  Moreover, both parties informed customers that they were operating competing businesses, although Movie Gallery may have had to expend some minimal resources to clarify this point with several customers.  Smith also quickly stopped using the email address with a suggestive name.  These issues of timing, notification, and extent of infringement suggest that, if Greenshields infringed such that there was some likelihood of confusion (which the unique facts suggest is unlikely), Movie Gallery suffered nothing and Greenshields gained nothing.

Movie Gallery nevertheless notes that, under the Lanham Act, it may be entitled to damages, costs, injunctive relief, and, in exceptional cases, attorney's fees.  The evidence simply does not establish any damages to Movie Gallery or profits for Greenshields based on the use of the VIDEO LIBRARY mark.  Movie Gallery's allegations of breach of the confidentiality agreement and misappropriation of trade secrets are far more

72

significant in this respect. In addition, injunctive relief would be meaningless given that Greenshields stopped using the mark almost immediately after he started. Moreover, the case is certainly not exceptional enough to award attorney's fees. Finally, because this court finds that the circumstances of Greenshields's use of the mark make it very unlikely that there could have been confusion, Movie Gallery has not prevailed on this claim and is not entitled to costs under 15 U.S.C. § 1117.

The court finds that Greenshields has not infringed on Movie Gallery's right under the Lanham Act by his brief and limited use of the VIDEO LIBRARY mark.


### E. Remaining Matter

Movie Gallery also brings a claim for common-law trademark infringement and violation of the deceptive-trade-practices laws of several States. The parties

agree, however, that the legal analysis for this claim is identical to the Lanham Act analysis.


                              ***


    For the reasons stated above and based on a review of the applicable law and a detailed examination of the extensive testimony and documentary evidence provided at trial, the court holds that Movie Gallery is not entitled to the relief that it seeks from Greenshields and his companies on any claims.  An appropriate judgment will be entered.

    DONE, this the 1st day of September, 2009.


                         /s/ Myron H. Thompson
                         UNITED STATES DISTRICT JUDGE